U.S. Bank National Association, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2007-ESH, acting by and through its Special Servicer, CW Capital Asset Management LLC, , Plaintiff,

against
Lightstone Holdings LLC, DAVID LICHTENSTEIN, LINE TRUST CORPORATION LTD, DEUCE PROPERTIES LTD, BANK OF AMERICA, N.A., WACHOVIA BANK, N.A., MERRILL LYNCH MORTGAGE LENDING, INC., U.S. BANK NATIONAL ASSOCIATION, as Trustee for MAIDEN LANE COMMERCIAL MORTGAGE BACKED SECURITIES TRUST 2008-1, DEBT II ESH, L.P., DEBT-U ESH, L.P., KEYBANK NATIONAL ASSOCIATION, and ASHFORD HOSPITALITY FINANCE LP, Defendants.


651951/2010

Defendant David Lichtenstein was represented by Robert Mark Novick, Esq., Kasowitz Benson Torres LLP, 1633 Broadway, New York, NY 10019 (212) 506-1758 RNovick@kasowitz.com.
Defendants Line Trust Corporation Ltd and Deuce Properties Ltd were represented by Brian M. Boyle, Esq., One South Street, 27th Floor, Baltimore, MD 21202 (410) 332-8541 bmb@nqgrg.com.
Defendant Wachovia Bank, N.A. was represented by Adam James Hunt, Esq., Morrison & Foerster, LLP, 250 W 55th Street, New York, NY 10019 (212) 336-4341 adamhunt@mofo.com.
Defendant Ashford Hospitality Finance LP was represented by Jed M. Weiss, Esq., Cole Schotz, P.C., 1325 Avenue of the Americas, 19th Floor, New York, NY 10019 (636) 563-8922 jweiss@coleschotz.com.


Barry Ostrager, J.

Reference is made to the Court's interim order of February 7, 2020 which is incorporated by reference. The interim order withdrew the partial decision in favor of Line Trust Corp. Ltd., Deuce Properties Ltd., and Ashford Hospitality Finance LP (collectively the "Junior Lenders") issued on the transcript of proceedings of February 6, 2020. The partial decision was withdrawn [*2]because the Plaintiff preserved the right to include in post-trial briefing excerpts from three deposition designations (Christopher Peckham, Isaac Neuberger, and Eric Franklin) and references to multiple documents in evidence, including two exhibits (Exhs. 45 and 46) which were admitted as purported summaries of documents in evidence but not for the truth of the contents of the summaries as they were post facto summaries, prepared by Plaintiff's counsel at some point prior to the trial of this ten-year old action.[FN1]
Trial Tr. 17-20. Extensive post-trial briefing was submitted on February 27, 2020. For the reasons that follow, the Court adheres to the ruling it made on the transcript of proceedings with respect to the Junior Lenders entitlement to retain the $31.4 million the three Junior Lenders received pursuant to judgments previously entered by the Court. The Junior Lenders established their entitlement to these funds by a preponderance of the evidence adduced at trial. The Junior Lenders' claim to recover attorneys' fees pursuant to Section 33 of the Inter-Creditor Agreement at issue in this case is granted on the grounds that the Junior Lenders are the prevailing party on their counterclaims seeking a declaration of rights against the Senior Lender. Inasmuch as Section 33 of the Inter Creditor Agreement only provides for the recovery of "reasonable" attorneys' fees related to the enforcement of the Junior Lenders' rights against the senior lender, the Court will determine the quantum of fees absent a stipulation of the parties. In all events, the Court will defer assessing fees until any subsequent appeal from this Court's order is resolved.
With respect to the Plaintiff's guaranty claim against Lightstone Holdings LLC and David Lichtenstein (the "Guarantors"), for the reasons that follow the Court finds that the Plaintiff is entitled to recover from the Guarantor $16,125,772 together with prejudgment interest and, as explained infra, no attorneys' fees. 
The trial of this ten-year old action took place on February 5 and 6, 2020. The parties to this action each claim either an entitlement to receive eight or nine figure sums of money or to retain eight figure sums of money. Given the stakes involved, it was perplexing that the trial concluded in a day and a half with only 500 pages of trial transcript, considerably more than half of which consisted of the reading of deposition testimony and colloquy of counsel with the Court. The trial record is, of course, closed as all of the parties rested with Plaintiff reserving [*3]the right to submit post-trial memoranda referencing three pre-trial depositions that were otherwise admissible at trial, but not read at trial in the interest of efficiency. The other parties filed post-trial briefs simultaneously with the filing of Plaintiff's post-trial brief.
Throughout the long-tortured history of this ten-year old case, each of the parties has asserted positions in Court proceedings that significantly vary with the positions the parties asserted at trial. In this respect, the case has a certain Jarndyce and Jarndyce quality to it. The parties have made so many motions, asserted so many different positions, entered into so many amended plans of reorganization in related proceedings in the U.S. Bankruptcy Court, filed tens of thousands of pages of briefs, affidavits and exhibits, and taken so many appeals that a relatively simple number of contested issues has exploded into a docket sheet in this Court containing 1212 entries and 40 motions, excluding appeals,[FN2]
and excluding a decade of voluminous filings in the Bankruptcy Court.
As noted in the Court's interim decision and order dated February 7, 2020, three financial institutions  Wachovia Bank, N.A. (now Wells Fargo), Bear Stearns, and Bank of America, collectively the ("Original Lenders")  provided approximately $7.4 billion in financing in connection with Lightstone Holdings LLC's acquisition of the Extended Stay Hotel ("ESH") portfolio of hotels. The loan was secured by mortgages on 664 hotel properties owned by ESH as well as assignments of leases and rents and security agreements pertaining to the various hotel properties. In addition, the sponsors of the ESH transaction issued guaranties of repayment of both the senior and junior debt, and a "bad boy" guaranty capped at $100 million which would be triggered by a bankruptcy of ESH. 
The Original Lenders divided the financing into senior debt ($4.1 billion) and junior debt (ten tranches of mezzanine/junior debt aggregating $3.3 billion) with the expectation that different tranches of the debt would be sold to third parties. The Original Lenders, which collectively funded 100% of the both the senior and junior debt, entered in an Inter-creditor Agreement dated June 11 2007 (the "ICA") which contained a Section 15(q) that was captioned "Non-Recourse Carveout Guaranty" (the "Guaranty") pursuant to which the sponsors guaranteed a capped payment of $100 million in the event of bankruptcy. In addition to the other guaranties the sponsors issued in connection with the financing the sponsors obtained, ESH filed for bankruptcy on June 15, 2009 and, thereafter, protracted bankruptcy proceedings took place involving years of litigation and, according to Alex Killick - Plaintiff's only fact witness - is ongoing.
The originating lenders of the ESH loans assigned the mortgage that secured the Senior Loan and related documents to Wells Fargo. In March 2009, Wells Fargo assigned to the Plaintiff Trust all of its rights, titles, and interests in the Senior Loan and related documents. The Trust is a commercial mortgage-backed securities ("CMBS") trust, and the beneficial owners of the Trust are certificate holders. Plaintiff filed this lawsuit on behalf of the investors/certificate holders in the Trust. CWCapital Asset Management LLC is the special servicer of the Trust.
The trial of this case presented two issues to the Court for resolution: (1) as between the Senior and Junior Lenders which party or parties is entitled to the proceeds of the $100 million Section 15(q) guaranty; and (2) whether, following the bankruptcy, there was a deficiency on the amounts received on the senior debt which would form the basis of a claim by the Senior Lender [*4]under either the $100 million Section 15(q) capped guaranty or the separate guaranty the sponsors gave to the Senior Lender. 
All parties agree that if there was no deficiency on the senior debt, the Junior Lenders, which were essentially wiped out by the bankruptcy, were entitled to retain the proceeds of their pro rata share of the Section 15(q) guaranty [FN3]
. Similarly, all parties agree that if the evidence establishes that Section 15(q), which the Appellate Division found to be ambiguous (103 AD3d 458, 450-60 (2013)), was for the exclusive benefit of the Junior Lenders, the Senior Lender has no claim against the Junior Lenders. And, while the Senior Lender disputes that the Senior Lender has no claim against the Guarantor if there is no deficiency on the senior debt, common sense and the applicable law require dismissal of the Senior Lender's claims against the Guarantor under either the Section 15(q) guaranty or the separate guaranty provided to the Senior Lender if there is no deficiency.[FN4]

During the course of what can only be described as a truncated trial, the Court raised two fundamental concerns. With respect to Section 15(q) the Court noted:
[T]here must be people alive who were present when these documents were drafted[]. . .it shouldn't be that hard to get to the truth of resolving this ambiguity.
February 5 Trial Tr. At 4:21-25. 
And with respect to the deficiency the Court noted:
I'm just trying to find out whether the Senior Lenders are whole or not. Because if the Senior Lenders are whole, then there is no reason for us to be here.
February 5 Trial Tr. 38:9-12. 
On June 15, 2009, the ESH borrowers filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. SOF, ¶ 29; J.L. Ex.2 (NYSCEF Doc. No. 1008). It is undisputed that the filing of the voluntary Chapter 11 petition was a recourse event under the Senior Loan Agreement and the Junior Loan Agreements pursuant to which the Guarantors became liable under the Guaranty. SOF, ¶¶ 30 & 32. Accordingly, the Junior Lenders filed suits against the Guarantors to collect the proceeds from the Section 15(q) Guaranty. SOF, ¶ 33. The Junior Lenders (except Ashford, which settled with the Guarantors prior to being awarded a judgment), were awarded judgments against the Guarantors. SOF, ¶¶ 33,35-37, 42. Plaintiff was aware of these actions and the Junior Lenders' efforts to enforce their rights to the Guaranty, yet Plaintiff neither intervened in the actions nor contested the Junior Lenders' rights to commence the actions. The Junior Lenders also settled [*5]any other claims the Junior Lenders had against the Guarantors.
In 2010, Plaintiff commenced this action against the Guarantors seeking a declaration from this Court against the Junior Lenders as to the priority of payments under Section 15(q). NYSCEF Doc. No. 1. Plaintiff's claims were, and are, based on the general contention that two general subordination provisions of the ICA — Sections 6 and 10 — control which group of creditors have priority to the 15(q) Guaranty as opposed to the more-specific provision of 15(q). Id. at ¶¶ 65-75. 
Turning to the 15(q) issue, the Plaintiff did not produce any witness with contemporaneous knowledge regarding the drafting intent of the Section 15(q). By contrast, the Junior Lenders produced at trial the principal drafter of the original language of Section 15(q), Lawrence Rouslin, who testified that Section 15(q) was drafted with the specific intent that Junior Lenders would receive priority on the Guaranty. The Junior Lenders also produced documents and deposition testimony from a representative of Wachovia, the lead lender on the original financing, and emails sent by an agent of Bank of America all of which suggested that the Guaranty was for the exclusive benefit of the Junior Lenders. In addition, the Junior Lenders produced the deposition of Mathew Robertson, the partner at Cadwalader, Wickersham & Taft ("Cadwalader"), who supervised then Cadwalader associate Lawrence Rouslin, who testified that he (Robertson) interpreted 15(q) to be for the exclusive benefit of the Junior Lenders.
The Senior Lender challenges Rouslin's testimony, which the Court credits, by arguing that Section 15(q) was modeled after earlier transactions in which there was a more explicit waiver of senior lender priority to a guaranty. The Senior Lender also argues that testimony elicited at trial and in depositions about the original lenders' concerns about the marketability of the tranches of junior debt should be disregarded because Section 15(q) was drafted before the time frame in which the Junior Lenders adduced evidence about concerns with respect to the marketability of the tranches of junior debt.[FN5]
Pointedly, the Senior Lender demonstrated that the language of Section 15(q) never changed during a two and one-half month period during which multiple changes were made to various other sections of the complex transactional documents. The Senior Lender also complains that it has been prejudiced by its inability to secure access to the files of Cadwalader to dispute the testimony of Messrs. Robertson and Rouslin because a special referee, this Court, and the Appellate Division have all held that Cadwalader files were privileged and immunized from discovery except for the very limited waiver of the privilege that this Court granted because of very special circumstances while preserving the privilege with respect to voluminous files in the possession of Cadwalader relating to both the transaction at issue and unrelated transactions. See generally U.S. Bank National Association v. Lightstone [*6]Holdings LLC, 167 AD3d 486 (1st Dep't 2018).[FN6]
In addition, Plaintiff cites "admissions" in certain schedules generated in the bankruptcy proceeding that purportedly support its position. Finally, the Senior Lender complains that various other documents drafted by Cadwalader, including, most particularly, an August 17, 2007 offering memorandum contradict the Junior Lenders position.[FN7]

The Court finds none of the Senior Lender's arguments more persuasive than the testimony the Junior Lenders adduced at trial. Neither Mr. Rouslin, nor Mr. Robertson, nor Cadwalader have any interest in the outcome of this case. Their testimony as fact witnesses was ordered by another Justice of this Court in April 2016. The Cadwalader attorneys' testimony is consistent with other less persuasive evidence in favor of the Junior Lenders in this case. See fn. 6 infra. Mr. Rouslin did not consult with counsel for the Junior Lenders in connection with his preparation for his trial testimony and he stated that he had an independent recollection of the ESH transaction and the drafting of Section 15(q). 
During the ten years this case has been pending, the senior lender had the opportunity to depose the various principals from the original lender group who likely exchanged non-privileged documents with each other concerning the intent of the parties with respect to the marketability of the junior tranches of debt and Section 15(q). Plaintiff presented no such evidence. In addition, the Senior Lender remained bystanders while Junior Lenders secured judgments against the Guarantors totaling $83,874.228. Of this $83,874.228, the sum of $52,545,755 was paid to junior creditors other than the three Junior lenders in this case, while the three Junior Lenders received a total of $31,328,473. The Senior Lender settled its claims against the other junior lenders similarly situated to the three Junior Lender Defendants in this case for a total of $3.925 million, or about $0.13 on the dollar. Trial Tr. 148-149; PTX 95-97. This would appear to speak volumes with respect to the merits of the claim against the Junior Lenders. With respect to the remaining $16,124,722 of the $100 million guaranty, which curiously found its way back to the Guarantors, that issue will be discussed in detail, infra.
[*7]The Intercreditor Agreement
As noted above, as the Original Lenders entered into the ICA. Joint Ex. 4 (NYSCEF Doc. No. 1039); SOF, ¶ 27. The ICA sets the priority of payments amongst the Senior Lender and Junior Lenders both generally and with respect to the 15(q) Guaranty. Section 15(q) of the ICA, which provides, in pertinent part, as follows:
(q) Non-Recourse Carveout Guaranty. Senior Lender and each Junior Lender hereby agree that the cumulative monetary caps set forth in Section 1.2 of the Guaranty (as more particularly described on Exhibits A, B, C, D, E, F, G, H, I, J and K hereto)(collectively, the "Guaranty") delivered to Senior Lender with respect to the Senior Loan and each Junior Lender with respect its Junior Loan (the "Guaranty Cap"), shall be applied on a ratable pro rata basis among each of the Junior Loans. For the purpose of this Section 15(q) the term "ratable pro rata basis (or share or portion)" shall be determined based upon the original principal balances of each of the Junior Loans as a proportion of the aggregate original principal balance of all the Junior Loans. Notwithstanding anything to the contrary which may be contained in this Agreement, each of the Junior Lenders shall have the right to commence and prosecute an action under its respective Guaranty, including without limitation, for up to the full amount of the Guaranty Cap and may apply any amounts recovered, up to its ratable portion, to the balance of its respective Junior Loan.
General claims for payment or recourse unrelated to the Guaranty are governed by other more general sections of the ICA, such as Sections 10 and 6, and are limited by Section 15(q). Id. at §§ 6 & 10. For example, Section 10 of the ICA, entitled "Payment Subordination," provides, in pertinent part as follows:

 Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by a Junior Lender of its rights and remedies with respect to the Separate Collateral (or, subject to the terms of Section 6(b) hereof, any Guaranty Claim) all of such Junior Lender's rights to payment of the Junior Loan held by such Junior Lender and the obligations evidenced by the related Junior Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan and the obligations secured by the Senior Loan Documents Id. at §10(a) (emphasis added).)
A similar exception exists in Section 6(b) of the ICA, which provides, in relevant part, that:
Nothing contained herein shall limit or restrict the right of any Junior Lender to exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any of its Separate Collateral that is not Equity Collateral and to apply the proceeds therefrom as it deems appropriate in its discretion (i.e., without payment subordination)(including exercising any remedy against any guarantor (a "Guarantor") pursuant to any guaranty granted to any Junior Lender as additional collateral to secure the obligations under the applicable Junior Loan Documents) (a "Guaranty Claim") subject to the terms and provisions of Section 15(q) hereof; provided, however, each Junior Lender agrees that it shall not pursue the enforcement of any judgments against Guarantor (but shall not be precluded from obtaining a judgment) pursuant to this clause (b) if (i) Senior Lender is simultaneously exercising any rights and remedies that it may have against such Guaranty under any guaranty granted to Senior Lender as additional collateral to secure the obligations under the Senior Loan Documents (except in connection with any Junior [*8]Leader pursuing its rights under Section 15(q) hereof), (ii) a Senior Junior Lender is simultaneously exercising any rights and remedies that it may have against such Guarantor under any guaranty granted to such Senior Junior Lender as additional collateral to secure the obligations under the Senior Junior Loan Documents and any right of payment of any Junior Leader under a Guaranty Claim shall be subject and subordinate in all respects to the rights and claims of Senior Lender and any applicable Senior Junior Leaders against such Guarantor (except in connection with any Subordinate Junior Lender pursuing its rights under Sections15(q) hereof). Id. at §6(b) (emphasis added).
Robertson testified that in drafting Section 6(b) of the ICA, he intended to make the Junior Lenders' right to payment subject to and subordinate in all respects to the rights and claims of the Senior Lender, with the exception of claims made under Section 15(q). Id. at 247:6-11. Likewise, Robertson testified that Section 10(b) of the ICA was "to give priority on payments received to the senior lender during an event of default, but it's specifically excluding payments with respect to the junior lender's separate collateral permitted pursuant to the Intercreditor Agreement and separate collateral includes guaranties." (Id. at 248:14-20.) Thus, Robertson confirmed, in all material respects, that claims to the proceeds of the Guaranty were intended to be an express exception to the general payment subordination provisions of the ICA.
Rouslin, who was "the first draftsperson of the ICA," (Rouslin Aff. at ¶ 5 (NYSCEF Doc. No. 1006)), likewise recalled negotiations over the specific guaranty provision in the ESH Transaction, and referring specifically to Section 15(q) of the ICA, indicated that the $100 million from the Guaranty was intended to be allocated entirely to the Junior Lenders. Id. at ¶¶ 7-8. Rouslin attested that his testimony was based on his understanding of negotiations and discussions among the Original Lenders as to their intentions as refreshed by his review of the ICA. Id. at ¶ 7 ("Based on my understanding of the negotiations and discussions among the parties, the intent of the parties at that time was to allocate the Cap entirely to the Junior Lenders. I drafted Section 15(q) to memorialize that intent."); id.at ¶ 8 (admitting he recalled the intentions of the Original Lenders); Trial Tr. at 225:9-226:11 (testifying that the basis of his testimony was his recollection as refreshed).[FN8]

Section 15(q) of the ICA would therefore appear to require that the Junior Lenders have priority to the proceeds of the 15(q) Guaranty. 
This is what Justice Schweitzer held in 2011 but that decision was reversed by the Appellate Division on the grounds that Section 15(q) is ambiguous. U.S. Bank, N.A. v. Lightstone Holdings LLC, 103 AD3d 458, 459 (1st Dep't 2013). Thereafter, the parties engaged in years of discovery that resulted in the exchange of hundreds of thousands of documents, countless depositions, extensive motion practice, much of which involved whether Plaintiff was entitled to documents that were repeatedly upheld as privileged. See, e.g., Mot. Seq. No. 038.
The individual designated as Plaintiff's sole fact witness, Alex Killick ("Killick"), lacked any personal knowledge about the ICA or even the ESH Transaction. See generally Affidavit of Alex Killick sworn to on Jan. 31, 2020 (NYSCEF Doc. No. 1092). Killick, a Senior Vice President of CWCapital Asset Management (the special servicer of loan), admitted that he had no personal knowledge about the intent of the parties with respect to the ICA. Feb. 5 Trial Tr. at 13:19-14:23. He did not begin work on the ESH loans until June 2015 Trial Tr. 12:3-5 which was five years after Plaintiff commenced this action and eight years after the loans were originated. Killick confirmed that the September 21, 2011 letters sent by Plaintiff's counsel to counsel demanding payment from the Junior Lenders were sent four years before he became involved with the ESH Transaction. Id. at 89:24-90:10. Killick also reconfirmed earlier testimony that he believed that individuals at Cadwalader (i.e., Robertson and Rouslin) were the ones with personal knowledge regarding the Original Lenders' intentions with respect to the Capped Guaranty. Id. at 90:11-91:3.
Where, as here, a contract or contract provision has been deemed ambiguous, the parties are entitled to "submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact." Bana Elec. Corp. v. Bethpage Union Free Sch. Dist., 76 AD3d 987, 988 (2d Dep't 2010) (citation omitted). Thus, the court may "look to extrinsic evidence to determine the intention of the parties." Matter of MPM Silicones, L.L.C., 874F.3d 787, 796 (2d Cir. 2017). The preponderance of extrinsic evidence admitted at trial regarding the Original Lenders' intentions as to the Guaranty establishes that the Junior Lenders' interpretation regarding the allocation of the Guaranty is correct.
Irrespective of whether the Senior Lender has a claim against the 15(q) guaranty, the Senior Lender has a separate guaranty from the Guarantors under the relevant transaction documents. There are three required elements for judgment on a guaranty claim: (i) the existence of an absolute and unconditional guaranty; (ii) the existence of the underlying debt; and (iii) that the Guarantors have not satisfied the underlying debt. Sections 1.1 and 1.2 of the Guaranty and Sections 9.4(a)(xvi) and 9.4(b) of the Loan Agreement establish an absolute and unconditional guaranty in the event of a borrower bankruptcy. The Borrower declared bankruptcy on June 15, 2009, which triggered the Guarantors' liability under the guaranty. Recognizing, as this Court does, that the Ashford assignment to Renwick and the ultimate [*9]transfer of $16,125,772 back to the Guarantors was a naked, fraudulent scheme, the issue is nevertheless the extent to which there is a deficiency on the senior loan that entitles the Senior Lender to collect the $16,125,772 and the other sums the Senior Lender seeks to recover against the Guarantors. 
As previously indicated, the Senior Lender is just wrong to assert that the Senior Lender is entitled to be made whole by mortgage foreclosure sales and related recoveries on the underlying debt and nevertheless reap a windfall and potential double recovery under a guaranty. Manifestly, a guaranty is, in plain English, security for the fulfillment of certain conditions (i.e., in this case repayment of the Senior Loan). Consequently, because the sponsor's guaranty was intended to secure the Senior Lender against the risk that the Senior Lender would not be made whole, the Court rejects the proposition that the Guarantor's liability on its guaranty is unaffected by recoveries achieved by the Senior Lender in the bankruptcy court and elsewhere. See New York v. Clarose Cinema Corp., 256 AD2d 69, 71(First Dept. 1998) (noting the inequity of potentially allowing the beneficiary of a guaranty to double recover the same funds).
So, while the Senior Lender is correct that the Note (JTX2) establishes the existence of the underlying debt, the Guarantors are equally correct that the Guarantors have no liability to the Senior Lender if there is no deficiency in the sums due to the Senior Lender, including all costs, expenses, and attorneys' fees incurred in litigation and collection efforts. The burden is, of course, on the Guarantor to demonstrate that there is no deficiency. 
Alex Killick testified that "the deficiency remains at approximately $158 million" today. Killick testimony ¶ 12. Mr. Killick further testified that while the Senior Lender had settled with some Junior Lenders in this action, "those settlements [which aggregated $3.925 million] did not reduce the deficiency because they are more than offset by the expenses incurred in the ongoing litigation." Id. Mr. Killick also testified that while certain settlements were reached in a separate "Litigation Trust" action (id. at ¶ 17-19), "the proceeds of those settlements have not been disbursed to Plaintiff, but rather they have been used to fund ongoing litigation." Id. ¶ 19. Mr. Killick asserted that the Senior Lender has not received any money from any other sources including the Litigation Trust and that the Guarantors have not paid anything to the Senior Lender. Id. ¶¶ 21-22. In addition, the Senior Lender relies on a host of alleged judicial admissions by the Guarantors at unspecified times in the bankruptcy proceedings and, most particularly, PX 47, which is inadmissible evidence for multiple reasons (see fn. 1, supra), and which, in all events, Mr. Killick could not explain. See Trial Tr. 57-62.
The record reflects that the borrowers paid both principal and interest on the Senior Loan in full and, Mr. Killick agreed that there would be no deficiency but for $253 million in "Liquidation Fees." Trial Tr. at 45-46. Indeed, Mr. Killick admitted that the Senior Lender would have a surplus of approximately $129 million, but for Liquidation Expenses of $253 million. Killick Trial Tr. passim (cross-examination by Guarantors). Plaintiff failed to establish with competent evidence the elements of these Liquidation Fees. Trial Tr. at 23:19-24:1, 27:25-28:5, 35:9-19, 36:9-13. Instead of testimony by a witness with personal knowledge, Plaintiff offered three documents to support its calculation of damages, Plaintiffs' Exhibits 45-47, which were either excluded or not admitted for the truth of the matter asserted therein. Plaintiff's Exhibit 47, which was produced weeks before the trial, was excluded in its entirety and is not part of the trial record. Trial Tr. at 292:13-293:13, 299:12-14. Plaintiff's Exhibits 45 and 46 were admitted only as summaries, not for the truth of the matters asserted therein. Id. at 299:12-13. 
Plaintiff's sole fact witness, Killick, was basically skewered on cross-examination. Mr. Killick conceded that the Plaintiff's assertion of a deficiency was entirely dependent upon crediting the Plaintiff with a $253 million in Liquidation Fees, although he could not explain what Liquidation Fees were expended, what they were expended for or even whether other deductions to the Senior Lender's recovery were not disguised payments to the Senior Lender. Mr. Killick has no direct knowledge of any evidence or specific basis for the amount of the alleged "Liquidation Fees" other than one unexplained line on PX 46. Trial Tr. at 35:20-22.
The Court is loath to conclude that the Senior Lender has willfully sought to exact payments to which it is not entitled. The Court finds the failure of the Plaintiff to provide particularization of the $253 million in Liquidation Fees troublesome. Equally troublesome is the fact that PX 47 was never produced until two years after discovery. Nevertheless, the Guarantors have failed to carry the burden of establishing the absence of a deficiency. 
The Guarantors have established by a clear preponderance of the evidence that any attorneys' fees incurred by the Senior Lender were recouped from settlements and funds received by the Litigation Trust. The Senior Lender asserted
[A] total claim against the Guarantors, exclusive of prejudgment interests and costs and attorneys' fees of 447,454,245, which include $31,328,473 that was erroneously paid to the Junior Lenders and $16,125,772 that remains unpaid by the Guarantors.
See Plaintiff's post-trial brief addressing its claims against the Guarantors. 

The Court has ruled that the Senior Lender is not entitled to the $31,328,473 held by the Junior Lenders. Ultimately, if the Senior Lender is given the benefit of every questionable accounting calculation sponsored by Mr. Killick's unenlightening testimony, the Court concludes that the most the Senor Lenders should recover is the $16,125,772 that the Guarantors essentially paid to themselves and sought to conceal.[FN9]

Accordingly, the competent evidence in the record supports, at most, Plaintiff's claim against the Guarantor in the amount of $16,125,72, including prejudgment interest at the statutory rate from June 15, 2009. 
Accordingly, it is hereby,
ORDERED that Plaintiff's first and second causes of action are granted in part to the extent of being entitled to $16,125,772, together with pre-judgement interest at the statutory rate of 9% per annum from June 15, 2009; and it is further
ORDERED that Plaintiff's third and fourth causes of action are denied with prejudice; and it is further
ORDERED that defendants Line Trust Corp. Ltd., Deuce Properties Ltd., and Ashford Hospitality Finance LP's counterclaims are granted, with reasonable attorneys' fees awarded in an amount to be determined. 
March 10, 2020
____________________________________
Barry R. Ostrager, JSC



Footnotes

Footnote 1: With respect to Plaintiff's unauthenticated Exhibits 45 and 46, the Court observed that these were undated documents "with no indication of who prepared [them], what information was included in the document[s], from what source and there's no readily apparent sponsor of the document[s]." Trial Tr. 19:14. They are "just a bunch of numbers." Trial Tr. 20:2. To the extent there is any ambiguity as to the evidentiary status of Plaintiff's Exhibits 45 and 46, those documents were admitted solely as purported summaries of other documents and not for the truth or accuracy of their contents. See Trial Tr. at 299. Alex Killick, Plaintiff's sole fact witness, asserted in his direct testimony that these exhibits were derived from information available to Plaintiff (Killick Direct Testimony ¶ 13). The numbers in PX 45 and PX 46 were supposedly derived from Plaintiff's exhibit 47, which the Court did not receive in evidence because it was first produced to the Defendants immediately prior to trial and more than two years after the close of discovery. Mr. Killick testified that Plaintiff found the document "in our system" . . ."within the last three weeks" before trial. Exhibit 47 which contains "multiple, multiple, multiple pages of microscopic numbers" (Trial Tr. at 293; see also Trial Tr. at 290-92) was the subject of an in limine motion to exclude from evidence which was properly granted.

Footnote 2: Two additional post-trial motions will shortly be scheduled for oral argument.

Footnote 3: As more fully set forth infra, $16,125,772 of the Section 15(q) guaranty was not paid to any Junior Lender and, curiously, found its way back to the Guarantor via a dubious assignment from Junior Lender Ashford Hospitality Finance LP (hereinafter "Ashford"), which had received a pro rata distribution of the Guaranty. 


Footnote 4: The Senior Lender relies on Nexbank SSP v. Soffer, 214 WL 245137 (NY Sup. 2014), aff'd 129 AD3d 485 (1st Dep't 2015). Nexbank, properly read, supports the opposite conclusion. There, the Court declined to dismiss on motion, a claim absent proof that the sums guaranteed had not been fully paid.
Footnote 5: This circumstance is of limited consequence inasmuch as marketability of the most junior tranches of junior debt could well have been an animating concern of the original lenders in the year preceding the great recession of 2008. And, Robertson testified that certain potential buyers of the mezzanine loans were given drafts of the ICA for their comments and input prior to the ICA being executed. Tr. at 237; see also, Trial Tr. at 267 (Robertson: "I recall at the time that the reason why this was being done in the market was for marketability of loans.").

Footnote 6: At trial the Court directed Cadwalader to produce any documents relating to Section 15(q) that have Mr. Fineman's name on them." Trial Tr. at 216. It was represented that all such documents were produced.
Footnote 7: There is unquestionably merit to this position. But, page 113 of the Offering Memo begins a section regarding the Junior Loans. (Pl. Ex. 3 at p. 113 (NYSCEF Doc. No. 1105).) Page 115 addresses the ICA. A section entitled, "Payment Subordination by the Mezzanine Lenders," contains the following language:
Except (i) in connection with the exercise by a Mezzanine Lender of its rights and remedies with respect to its Mezzanine Collateral in accordance with the terms of the Intercreditor Agreement or (ii) as otherwise expressly provided in the Intercreditor Agreement, all of the Mezzanine Lenders' rights to payment of the Mezzanine Loans and the obligations evidenced by the Mezzanine Loan documents are subordinate to all of the Mortgage Loan Lender's rights. . .


Id. at p. 120 (emphasis added).)
Footnote 8: The Junior Lenders offered other less compelling evidence in support of their position. For example, in a June 21, 2007 email, Robert Boyd, Esq., an attorney from Sidley Austin LLP, counsel for Fortress (a potential buyer of junior debt), asked the Original Lenders whether the Guaranty would be allocated pro rata amongst the Junior Lenders only or the Senior and Junior Lenders. (See J.L. Ex. 14 (NYSCEF Doc. No. 1020, the so-called "Boyd e-mail chain"). Forastiere, of Bear Sterns, responded that it was his understanding that the allocation was pro rata among the Junior Lenders in other transactions and Fineman of Wachovia agreed on behalf of the entire bank group. (Id.) Fineman testified that the phrase "we agree" in the email was on behalf of the entire bank group involved in the ESH Transaction. Trial Tr. at 187:9-14, 194:11-21, & 199:23-200:5. The Boyd email chain post-dates the drafting of Section 15(q). Nevertheless, Fineman testified by deposition that based on the email he wrote, "the junior tranches of debt were entitled to the guaranty proceeds." (Id. at 194:20-21 (emphasis added).) The Court attaches minimal weight to Fineman's deposition testimony because given the stakes involved in this case, it was incumbent upon the Junior Lenders to secure his live testimony at trial as Fineman lives in Florida but has an office in New York. But Mr. Robertson reviewed the Boyd email chain and understood "that Mr. Fineman is saying that all of the bank group is agreeing with what Michael Forastiere had said in the previous email." Trial Tr. at 245. The Junior Lenders also introduced into evidence two emails from an agent of Bank of America (Hoyle), in which it was stated that the Junior Lenders have priority to the Guaranty. (See J.L. Ex. 18 ("The springing $100mm provision for a voluntary or collusive involuntary BK [bankruptcy] applies only to the mezz loans, pro-rata.") (NYSCEF Doc. No. 1024); J.L. Ex. 27 ("It's all one guaranty instrument and the $100mm BK recourse is allocated pro-rata among the mezz tranches by the IC.") (NYSCEF Doc. No. 1033).) The Bank of America emails also post-date the drafting of Section 15(q). No other documents, including, without limitation, any of Plaintiff's voluminous trial exhibits, address or speak to the Original Lenders' intentions, although, as previously noted, there are "people alive who were present when these documents were drafted".
Footnote 9: This result is consistent with the holding of the First Department that "no reading of the IC Agreement gives the Junior Lenders an exclusive right to bring claims against the Guarantors, or granted them exclusive rights to the guaranty cap." 103 AD3d 458, 460 (1st Dep't 2013).